Mosley, Jr. v. Zachery So, Mr. Hatchett. Good morning, Your Honors. May it please the Court, my name is Andrew Hatchett, and I'm the Court-Appointed Counsel for the appellant in this case, Tommy Mosley. And as the Court knows, Mr. Mosley was the plaintiff below and brought an Eighth Amendment claim for failure to protect against Defendant Towanda Zachery. And the District Court, throughout that claim, at the summary judgment stage, concluded that he did not have evidence in the record to support a finding of deliberate indifference, which is that the defendant was subjectively aware of a substantial risk of serious harm and that she disregarded that risk. That decision was an error because at multiple points in the analysis, the District Court either disregarded evidence that was properly before the Court at the summary judgment stage or drew inferences from disputed evidence in the light most favorable to the movement, Defendant Towanda Zachery. So, I do, on appeal, want to discuss the evidence, but I think it's important to place this case in some context. And this Court's recent decision in Marbury really helps with that. And that decision came out last August, and what that decision does is it distinguishes between, and just to orient the Court right now, I'm talking about the subjective prong of the deliberate indifference analysis. What Marbury does is it talks about there's two different types of threats and risks that can be posed in prisons. One is general, general prison condition cases, you know, this is an unsafe environment, and some are specific. Counsel, I want to only speak for myself, but I think you probably have me on the subjective element. In other words, I think this case is more like Marbury and less like some of the general ones. I think the magistrate judge focused more on the objective prong of the deliberate indifference, and that's where I'm having more of an issue. And so I just only tell you that to maybe focus you on that, but I don't want to cut you off from the argument you're about to make. Sure. I mean, if the entire panel is aligned. I can only speak for myself. Trust me, he doesn't. He does not. Okay. Well, let me speak to your comment first, and then I will return. But when we talk about the objective prong, and I do want to emphasize this, because unfortunately it's something that we did not emphasize in our briefing, but I actually think that Lieutenant Zachary has conceded that point below. And so when you look at Rodriguez and Caldwell, actually in both of those cases, the objective prong of the deliberate indifference test was not disputed. And so in Caldwell, I mean, what the defendant said is the defendants do not dispute that if they had actual subjective knowledge that Caldwell faced a substantial risk of serious harm, their alleged failure to make any attempt or take any action to minimize the risk. But, counsel, that was because those were what I'll call do-nothing cases. Yeah. I'll use that as just a shorthand. Sure. Is this a do-nothing case? I would suggest that it is. I want to orient the Court to Ms. Zachary's declaration that she submitted below. It's tab 63. It's page 668 of the Joint Appendix. But at paragraph 10, she says, if I felt that Mr. Mosley's safety was at risk following the hearing, I would have immediately investigated that risk and arranged for a move separating Taylor and Mosley. And so I think that below, she's done the exact same thing that the defendant in Caldwell did and basically said that I would have done something different if I had known. But that's not my question because that doesn't go to the objective standard. Objectively, did she do nothing? Objectively, she did nothing. I mean, how is that the case where she seemed to credit what they said, suggested she will look into it, told them that they were already thinking about doing a move, said, please go back to your cell, which she knew was a locked cell and where he was individual. In other words, they weren't in the same cell, so that she can complete the count and conduct an investigation. And 90 minutes or so later, the incident happened. How is that nothing? How is that an ignoring like happened in Caldwell and Rodriguez, the cases you're discussing? So in Rodriguez, what the prison official said in that case is, if somebody tells me that my life is in danger, that there's a death threat against this inmate, what I'm going to do is I'm going to immediately segregate that inmate until I can resolve the threat. That's not quite my question, though. How is that doing nothing? How did she do nothing? If the facts are as I just stated. I mean, she could have been, there's no way she could have done anything that was less helpful than what she did. Well, of course she could. We know that because the cases say some of them laughed at them and said, no, I'm not doing anything, or completely ignored weeks and weeks of entreaties to help. This is not that. This was one time my life's in danger. She said, I got your back. She said, I'm going to credit it. I'm going to look into it. Go back to your cell where you're not with that person so that we can conduct the count that I'm in charge of right now. And then within that time frame, the incident happened. That's not nothing, is it? So, I mean, she sent him back into the prison population with an inmate who was unrestrained and available to attack him, which is what happened. This is countdown, right? I mean, this is a controlled, supervised event in the prison, right? Where he's returning to his cell. He's not in a cell with the person who's made the threat, right? And this officer would have every reason to believe that there are officers in the prison who are supervising inmates as they return, right? So the assault did not happen during count time. It happened after count time. And there's some ambiguity in the record. But the order to go back to your cell during this countdown, that's a reasonable response in this circumstance, isn't it? This is something, this is a controlled event in the prison. Go back to your cell.  Count time was taking place. I mean, she didn't do anything to protect him, to keep him in confinement after count time concluded. I mean, there was a point when she had to do something more than, I mean, say, hey, while I'm investigating this, you can, you know, wait down there in this dorm where, you know, inmate Taylor is available to assault you. Let me try to get at what they're getting at in a slightly different way. What evidence is there in the record to show that it was objectively unreasonable for her to wait until after the count procedure had been completed? And I understand you're making an argument that she waited again after that. But what is the evidence in the record of the immediacy of the threat that required her to suspend everything and handle it right that moment? Her own admission. I mean, this is her declaration in the district court. She says, if I felt that Moseley's safety was at risk following the hearing, I would have immediately investigated that risk and arranged for a move separating Taylor and Moseley. But what does it, that's vague. What does it mean to immediately investigate? I mean, the same thing that. She did immediately investigate. This is what they said in the defendant in Caldwell said. Can we break that down a little bit even further to hone in on that? She said, if I felt after the hearing, right. That's what she says. Right. That she hadn't heard yet about the threat after the hearing. The hearing went perfectly fine. She didn't think there was anything wrong after the hearing. If she felt that the hearing there was an issue, she would have investigated. That is far different from what we have right here. Right? You know, that could be the inference that she, I mean. That's what it says. I mean, I think that that's drawing inferences in favor of the movement in this case. I think if you draw the inferences in favor of. It's an objective standard. We've got to figure out whether it was reasonable here. So, I mean, if you look at Rodriguez and you look at Caldwell. I mean, this would be the first case that a defendant in this line of cases involving specific threats where there's been a specific argument by the movement that not taking an immediate action. And by immediate action, immediately segregating the two individuals. But there's a few facts that separate this that make it a little different for me. One is the time gap. So it's such a short time, unlike those cases where there was over and over and over again requests. That's one. The other is, again, it doesn't seem to me. And, again, this is only, I can only speak for myself, that this is a do-nothing case. Because she did something. Now, is this was something effective? Obviously not. You got injured. But effective is not the standard. The standard is did you act reasonably under the circumstances. And given the time frame, given the impending count, given that she didn't think originally that there was an issue to begin with and only first heard about this, can we say that that's objectively reasonable in every single case? She did nothing to ensure a safe passage back to the cell block. I mean, whether the time frame that it happened, I mean, she said go back to the cell. She took no action to ensure a safe passage back to the cell. She did nothing to make sure that, I mean, obviously we know that he was not secured because he got assaulted. Didn't she know also that during the threat, the inmate, the threatening inmate, came into your client's cell, said I'm going to kill you. Your client said get out. And he got out. She knew that fact, didn't she? So I'm not clear whether she knew that or not from the record. Well, does she clearly know that he was threatened and yet he wasn't attacked at that moment? Well, I know that she knows that he was threatened. I know that she knows that, I mean, Robert Leonard wasn't in the cell. He had obviously heard the threats as well, and he went with her to report the threat. And so apparently the record says that at some point after that altercation in the morning, he, inmate Taylor, was growing increasingly agitated, was spreading around the room, like I'm going to kill him, I'm going to harm him. Other inmates were hearing it.  Robert Leonard hears it and then goes with him to report, said this is actually a serious threat. I mean, he's going to act on it. I mean, he went and corroborated the circumstance to her, which an officer hearing that, hearing saying, hey, multiple inmates are saying that there's a death threat against this inmate's life. And I actually don't know that you say that count time is a secure environment. The government has never made that argument. They've said that they couldn't. I thought there was evidence, though, that what the guard did was adhere to prison policy and that it would have to be an extreme situation for the guard to deviate from that policy, that what the guard told him to do in returning to the policy was in accordance with prison policy. So with respect, I would say that's drawing inferences in favor of the government. There's nothing in the record that suggests that it requires extreme measures to deviate from count time policy. It says if you're going to depart from count time policy, this is how you do it. We try to keep outcomes to a minimum. I thought there was evidence that said nothing short of an emergency. Okay. So that's fair. I'm staying corrected there. But the, I would say a death threat is an emergency. And that's the argument that we made in our brief, is that a death threat is an emergency. Counsel, on the issue of the lockdown, though, we have the, as I understand it, we have the guidelines and evidence. And if we have evidence that those guidelines were followed, those show that countdown is a lockdown situation, don't we? So I'm not familiar with that. I mean, I would have to reorient myself to the record. But I do not believe that, I mean, it's a complete lockdown. I mean, obviously, he was walking freely through the cell when he was assaulted by Amy Taylor. Pre-lockdown. It's unclear whether it was pre or post. Before you sit down, the concern, obviously, is that any time an inmate makes a, reports a very serious threat, if something happens before the prison officials can react, then there would be a constitutional violation. That's the concern. And so there has to be some evidence that it was unreasonable for Zachary to wait until after the count to take any action. In my mind. I don't know that I speak for the panel. But that's my concern. Sure. Can I have just a moment? Absolutely. I mean, obviously, I know I have rebuttals as well. But, you know, I think that— Just take your rebuttal time. Caldwell and Rodriguez, I mean, what those cases establish is a need to take immediate steps. And that's what, I mean, the defense in Caldwell didn't dispute that once we were made aware of the threat, returning him back to his cell or into a spot where he could be assaulted is unreasonable. And so I think that that's clearly established by that time, that you have to, you cannot put the person in a spot where he can be assaulted once you know that there's a substantial risk of serious harm. And, you know, what exactly happened during count time, when count time occurred, when he was assaulted, is not entirely clear from the record. But what we do know is that nothing was done to prevent them from being in a spot where he could assault him. I mean, it happened for two hours. It was a two-hour assault. It's not like this was just like a minute or two that he was hanging out down in the cell. I mean, he was beat for nearly two hours, and no prison guard was around to do anything. And so whether they comply with count time policy or not, I just don't think that that can be an objectively reasonable response to leave someone in a position where no guard observes a two-hour assault with a lock and a shank in a prison cell. Okay, Mr. Hedges, thank you. You've saved three minutes for rebuttal. Ms. Gore. Thank you, and may it please the Court. The district court properly granted Lieutenant Zachary's motion for summary judgment because Mr. Mosley failed to produce evidence showing that she acted with deliberate indifference. In particular, he failed to produce evidence to show that she was actually aware that Mr. Mosley was faced with a substantial risk of serious harm at the time the threat was communicated and that she disregarded that threat in an objectively unreasonable manner. Accordingly, the district court's order should be affirmed. And I want to mention that even if Mr. Mosley produced or this court found that he produced sufficient evidence to raise a disputed issue of fact on the underlying Eighth Amendment claim, he has not met and cannot meet the demanding standard of showing that existing law at the time of the incident clearly showed beyond debate that Lieutenant Zachary's conduct in these circumstances was unconstitutional. So she is entitled to qualified immunity, and the Court should affirm on that ground as well. I'm going to go quickly to— Let me go back to what we were discussing with your other counsel before you stood up, which is that if—assuming that Zachary is aware that there's a serious threat of harm, here a death threat, so it's clearly serious, why doesn't she have an objective obligation to ensure that Mosley is protected from the moment he leaves her presence? I think, Your Honor, that those two prongs are connected, and I think it's hard to disconnect them. As Your Honor mentioned, she does have to be actually aware of a substantial risk of serious harm. Well, let's assume that she's aware of that. Okay. Assuming that she's aware of a risk of harm, which I think in this case, we can say she's aware of some risk of harm, but even assuming she's aware of a substantial risk of serious harm, the Court has to look and does look in prior Eleventh Circuit precedent at the circumstances. What is she aware of? What does she plan on doing? And what does she do? And in this case, what we know from the record is that after being informed of the threat to Mr. Mosley, and again, I'm setting aside whether that gave her actual knowledge of a serious risk of harm, which I do not believe it did, but even assuming, she did not do nothing at all. So what she did was she explained to Mr. Mosley, here's how I'm going to handle it. His counselor is looking into moving him anyway. I'm going to send you back to your dorm, but it is count time, so I'm sending you back to the dorm right now, which is count time. Count time, and the evidence is in the record, the SOP, as to what count time amounts to. Count time, it says in the SOP, during count time, inmates will remain locked or under close supervision in the area in which they are counted until the count is clear. An inmate shall be required to stand at attention by their bunks or cell doors during standing counts. So yes, she had a responsibility to respond in an objectively reasonable manner, but she's sending Mr. Mosley back to a dorm in which count time is about to begin. So there will be a significant officer presence, and she's aware of that. What about his argument that the assault occurred for two hours, and it was 90 minutes after the, I don't know if it was 90 minutes after their meeting or 90 minutes after the count time, but it was clearly, if you take the inferences in his favor, it was clearly sometime after count time ended that the assault occurred. Your Honor, I don't, it's unclear from the record how far after count time occurred because it's unclear whether there was, exactly when count time started, it seems to have started shortly after their conversation. It's unclear how long count time lasted. And then as far as the length of the attack, Mr. Mosley testified in his deposition that it was between an hour and a half, excuse me, and two hours, and that inmates kept shutting the cell door repeatedly to avoid officers from noticing that anything was going on. So although he pressed the button, apparently, to leave the cell, other inmates in the dorm kept shutting it for some reason. So that's the testimony. So it is unclear from exactly how long elapsed, how long the fight occurred and how long elapsed between the conversation Ms. Zachary had and the start of the fight. And it seems to be anywhere from 30 minutes to an hour. But that's not all she knew when sending him back to this dorm. She also knew that this dorm, because Mosley testified as much, this dorm is a dorm that has self-locking cells. And Mr. Mosley testified in his deposition that an inmate can generally go into a cell and activate the lock and that other inmates, aside from their roommate, of course, or cellmate, that precludes them essentially from coming into the cell. So she's sending him back to a cell with that structure. She's not sending him back to, and this is a distinct situation from some of the other prior 11th Circuit cases, including Caldwell, she's not sending him back to a cell with Mr. Taylor. He's not a cellmate. And I think there's a few other things that are important to point out in terms of her reasonableness and what she knew because her reasonableness and her response is a function of what she knew at the time. And she also knew that approximately an hour and a half had lapsed since this hearing that, according to Mr. Mosley, was what sparked Mr. Taylor's anger, and nothing had happened in that time. She knows that Mr. Mosley is approaching her walking around the facility. He's not locked in his cell. He didn't lock himself in his cell. And her perception likely is that he wasn't afraid of an immediate and substantial risk of harm from Mr. Taylor because he didn't act as if there was one. So an hour and a half passes. He approaches her. He doesn't lock himself in the cell. And I think importantly, both to whether she perceived a substantial risk of serious harm and to the reasonableness of her response to whatever risk she did perceive, importantly, when she did speak to Mr. Mosley and say, here's what we're going to do. We're going to send you back to your cell. It's count time. You're about to be late for count time. I'm going to look into it. And it looks like the counsel is already thinking of moving to him. He did not push back on that. Counsel, what was clearly established by Rodriguez and Caldwell? Was it that when there is, again, assuming a serious threat that would trigger some sort of action, that it be done immediately? Was that what was clearly established there? No, I don't think so, Your Honor. And I respectfully disagree with counsel on that. Can I quote something from Caldwell and ask if this is what's clearly established? Of course. Caldwell says towards the end on the clearly established prong, and they helpfully headed it clearly established law. This court already clarified that a prison guard violates a prisoner's Eighth Amendment right when that guard actually, objectively and subjectively, knows that a prisoner poses a substantial risk, yet fails to take any action to investigate, mitigate, or monitor the substantial risk. I think certainly Caldwell sets forth that standard. And I think Caldwell, if you look at the entire case, and you look at what Caldwell relied on, which is Catone, in finding that qualified immunity was applicable, it's not such a broad finding. It's not such a broad standard. Well, even if that is the broad standard, even that, which I know you contest. You think it should be more fact specific. I understand that. But even that doesn't state that it has to be immediate. It just has to take any, that the failure to take any action is what causes the Eighth Amendment as clearly established, right? I agree with that, Your Honor. Without conceding that there might be certain circumstances where taking no action does not violate the Eighth Amendment. Of course. Absolutely. Yes. So Caldwell, and I'll pivot over there for a minute, because I think the qualified immunity is an important aspect of this case. And Caldwell and Rodriguez are the two cases on which the appellant relies. So I want to switch over to that briefly. Can I ask you one other quote from Caldwell in that same section? Yes. It also states that the law of this circuit, at least in 2009, as expressed in Cato in the case you talked about, clearly established that the defendant's total failure to investigate or take any other action to mitigate the substantial risk of harm posed is what caused the Eighth Amendment violation or what would trigger a deliberate indifference finding, right? Yes. The court did state that.  But even under the general there, would the facts here have triggered that? Would an officer clearly have known that doing what Officer Zachary did here would be deliberate indifference? Absolutely not. And again, I don't think we have that total absence of doing anything in this case. So just on using that language, it doesn't apply here. But I think the other thing that is a critical distinction between Caldwell and this case is that the officer has to know that there is a— has to be actually aware of a substantial risk of serious harm. What we had in Caldwell was a situation where any officer would be actually aware of a substantial risk of harm for numerous reasons that don't apply here. Mr. Pinson, Inmate Pinson, who ultimately attacked Mr. Caldwell, was a known violent offender. He was housed in a special unit for known violent offenders. He had a history of assaulting other inmates. He had told one of the defendants, I don't want a roommate, to which the defendant responded, defendant guard responded, I don't care, then kill him. He started a fire in the cell in the presence of Mr. Caldwell, which threatened his life. And another critical fact, when—after Mr. Caldwell was rescued from this fire, he stated to the defendants, I will be killed if you put me back in that cell. I'm afraid of him. I'm afraid for my life. None of that is parallel with this case at all. We don't have a situation of a known violent offender. We have a situation here where Inmate Taylor is in an honor dorm. They're both in an honor dorm. There's no evidence that Inmate Taylor has ever laid a hand on any other inmate. And there's certainly no evidence that Ms.—Lieutenant Zachary is aware of any, even mildly violent behavior on the part of Inmate Taylor. That is a distinction that's very important between Caldwell. And that distinction also applies to Rodriguez. Because in Rodriguez, we're dealing with threats from members of the Latin Kings, a gang which the prison in the record indicates had a terrible problem with, a terrible problem with violence. So that is a factor, a general factor. I think these cases on their facts are clearly distinguished. But even if you look from a broader perspective, you have a situation of cases where you have defendants who know you're dealing with a violent offender. So that informs what you need to do. And doing nothing in the face of a threat to kill someone from a known violent offender is a totally different situation. And it's what we don't have here. And the second way I think that these two cases, again, even from a broad level, cannot clearly establish the law in this case and are very distinct, is in terms of the threat that was expressed to the defendant official. In both Caldwell and Rodriguez, the plaintiff made clear, I will be killed if you put me back in that cell. I will be killed if you put me in general population. In Rodriguez, on multiple occasions, Mr. Rodriguez said, I need to be transferred or I need to be placed in protective custody or I will be killed. And he, in fact, was attacked within 15 minutes of being released into the general population. As I understand it, you would say that the absence in this record of evidence of an immediacy with the threat affects both whether it was a substantial risk for purposes of the subjective element and whether the officer's response was a reasonable one. Yes, I think that informs both of those elements that are required elements. And I think in this case, the absence from Mr. Mosley, this case, as the magistrate judge observed in the order, this is the case where the evidence isn't even sufficient to show that Mr. Mosley felt that he was at immediate risk of substantial harm. Even Mr. Mosley wasn't. He told Mr. Taylor, whatever, Sean, get out of here, I'll clear it up later. He hung around in the dorm for an hour and a half. He goes up to Pilk Hall and happens to see Ms. Zachary coming out of her room, so he approaches her at that time. Whether he would have otherwise, it's unclear from the record. And when Ms. Zachary says, here's the plan, here's our approach, he doesn't provide any pushback. He says nothing similar to what Caldwell and Rodriguez say, which is, I am afraid for my life. Doesn't the record indicate that when she sent him back, he did say something? He did say, when she did say to him, I've got your back, don't worry about it, he said, well, how can you have my back when you're here and I'm there? So admittedly, that may show she and he was aware of some risk of harm. But an awareness of some risk of harm is not sufficient for a deliberate indifference claim. It has to be an awareness of a substantial risk of serious harm. And Mr. Mosley's actions, when you look at the rest of that interaction, show that even he did not have that appreciation of any substantial risk of serious harm. Certainly, to then say that Lieutenant Zachary should have an appreciated and a risk that Mr. Mosley did not appreciate, he's the one who received the threat, he didn't communicate that to her. The inmate in Caldwell did and the inmate in Rodriguez didn't. I think that is a substantial and an important distinction, a material distinction between and among those cases. And it goes both to the fact that there was no Eighth Amendment violation shown here and it also goes to the fact that there is no clearly established law that shows in these circumstances Lieutenant Zachary acted with actual knowledge of risk of serious harm. So we would ask that the court affirm the district court. Thank you. Thank you. Mr. Hatchett, you've saved three minutes. Only I had an extra three on top of that. Quickly, in three minutes, I do think that the argument that we've heard is perpetuating a lot of the same problems that we believe that the district court has committed in terms of drawing inferences in favor of the movement here. When we talk about the time that Lieutenant, that he went, actually her declaration, the same one I pointed to earlier, says that the hearing took place at 945. And so that means that he entered his cell probably sometime around 10, 1030, and he reported almost immediately after that. And so you can draw that inference on whether or not he gave pushback. He did give pushback. It's appendix page 300. He said, if you send me back there, how are you going to protect me? And she says, go on back. And we talk about whether this is a do-nothing case. And so I know that I've argued that this is a do-nothing case, even accepting the premise that this is a do-something case. What she did was she sent him back to his cell, and either the assault happened before count time. If it did, there was a two-hour assault in the middle of count time, and count time isn't very good. So if it's after count time, then we're talking about a period of about four hours. Let's say I get there, and let's say that I believe that's reckless disregard. How do I find then that's intentional and knowing under the law as it existed at the time, based on those general statements from Caldwell and Rodriguez that I quoted earlier? So intentional knowing is not the standard. I mean, the standard is you have to – it has to be – Clearly established.  On qualified immunity, it's clearly established. That's what I'm talking about. You know, I would say that I do believe that Rodriguez and Caldwell provide materially similar precedent that would say that you can't put someone in a spot. If you know that we're accepting a qualified immunity, that she knows that there's a substantial risk of serious harm, that there's a real death threat, and then Caldwell and Rodriguez are going to establish that you cannot put the person in a place where for two hours he can be assaulted without any prison guard being within earshot of him. That's going to be an objectively unreasonable response. But I would also say that you look back at Hope, and I recognize that, you know, Hope says you can also have situations where the constitutional rule applies to a set of facts with obvious clarity. And the prison guard in Rodriguez said, if a prisoner tells me that their life is in danger, I'm going to say immediately, I'm going to segregate them from the assaultant, and I'm going to investigate and make sure that that risk is abated. That's what the prison guard said in Rodriguez. That's what Lieutenant Zachary said here, is that if there's a risk, I'm going to immediately segregate them. And so nobody, I would say with obvious clarity, whether there's a materially similar precedent, whether we want to, you know, quibble what the facts of Caldwell and Rodriguez, no prison guard, reasonable prison guard in Lieutenant Zachary's position, could believe that sending him back to the cell, and we know she didn't investigate because she certainly didn't do anything in that three-hour block that he was assaulted for two of them. Repeatedly, with prison, apparently people outside the cell shutting the door on him, I would say that that's an objectively unreasonable response, and any prison official in that position would know that at that time. Thank you. Mr. Hatchett, as you mentioned earlier, you were court appointed, and I want to thank you for accepting that appointment and discharging your responsibility very ably this morning.